## C. H. MEAD COAL COMPANY, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 42718, 42719, 54660. Promulgated June 30, 1933.

*Frederick L. Thomas, Esq.*, for the petitioner.
*T. M. Mather, Esq.*, for the respondent.

604

OPINION.

MATTHEWS: 1. The issue with respect to depreciation falls under two heads—(a) the basis to be used, and (b) the rate to be used in determining the depreciation allowable on steel rails.

(a) The petitioner recognizes that cost is the basis to be used in determining depreciation and contends that $335,000 was the cost to it of the depreciable property acquired upon its organization in 1920. Respondent contends, on the other hand, that the petitioner paid only $235,000 for the property and has calculated depreciation on this basis.

The facts, simply stated, are these:

C. H. and C. S. Mead obtained an oral option from the East Gulf Coal Co. to sublease 2,500 acres of coal lands, which carried with it the right to purchase the plant and mining equipment placed on the leased lands by the East Gulf Coal Co., and the right to the proceeds of a contract with the Virginian Railway Co. and to certain rents, the Meads to assume the royalty obligations under the original lease, to pay the East Gulf Coal Co. $50,000 rent a year for 12 years and to pay $235,000 for the physical equipment on the property. They offered to sell the option to the petitioner in return for 1,000 shares of petitioner's stock having a par value of $100. This offer was accepted by petitioners, the 1,000 shares were issued by the Meads for their option and the purchase price of $235,000 for the physical assets paid over by the petitioner to the East Gulf Coal Co.

Petitioner added $100,000 to the cost of the physical assets and contends that this was proper because the property when received from the East Gulf Coal Co. was in fact worth at least $335,000, and the 1,000 shares of stock issued to the petitioner were worth par.

Although the evidence shows that the stock was worth par at the time it was issued to the Meads, and the physical property was worth at least $335,000, the $100,000 paid for the option does not represent an additional cost to petitioner of physical property alone. It represents cost to petitioner of all the properties acquired

from the East Gulf Coal Co. No evidence was introduced to show how the $100,000 should be apportioned between the physical properties, the sublease and the rights under the contract with the Virginian Railway Co., and to certain rents. The fact that the physical properties were worth at least $335,000 at the time they were acquired by the petitioner does not furnish any basis for allocating the total amount paid for the option to such properties. The lands which were leased were very valuable coal lands and the acquisition of a lease on such lands might well have been worth $100,000 to petitioner without the acquisition of the mining equipment already on the lands. There is absolutely no evidence from which we could find what, if any, portion of the $100,000 should be allocated to the physical property. In the absence of such evidence, the determination of the respondent as to the basis for depreciation must be sustained.

(b) As to the second point raised on the depreciation issue, whether steel rails in a mine depreciate at the rate of 10 percent a year, as contended by respondent, or at 12½ percent, as the petitioner urges; we are of the opinion that the more rapid depreciation in petitioner's mines is sustained by the evidence, and have so found. Petitioner's witness, Nowlin, its secretary-treasurer, calculated the average life of a steel rail in petitioner's mines—with their curves, grades, slate falls, etc.—was six years. The petitioner had some $25,000 of tracking and its replacement was about $4,000 a year. It would appear, therefore, that depreciation on steel rails in petitioner's mines was about 16 percent, certainly as much as the 12½ percent claimed. We do not think the rate of 12½ percent unreasonable for the years before us.

2. We come now to the question of whether petitioner sustained a loss of $82,438.26 in 1925 on the exchange of stock resulting from the reorganization of the Interstate Coal & Dock Co., a Maine corporation, in which petitioner was a stockholder to the extent of 2,083 shares. If this transaction was a "reorganization" within the meaning of the 1926 Revenue Act, of course, no loss on such an exchange will be recognized to the petitioner. See section 203 (b) (2), set out in the margin.[1] If such an exchange does result in a taxable gain or loss, the petitioner's valuation of the stock received in exchange is sustained by our finding that it was worth at that time not more than $40 a share. The facts of the transaction may be summarized as follows: Petitioner was a stockholder of the Maine corporation. The Maine corporation owned 9,600 of the total 13,516 shares of the Low Volatile Consolidated Coal Co., a West Virginia

---

[1] Sec. 203. (b) (2) No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

corporation, or something over two thirds of its capital stock. The assets of the Maine Co. were mortgaged to a bank on October 10, 1922. On May 9, 1925, the president of the Maine Co. and of its subsidiary, the West Virginia corporation (C. H. Mead being vice president of this company) sent out jointly a circular letter to all stockholders of both companies, pointing out that the mortgagee bank was in need of money and would shortly commence foreclosure proceedings; that the indebtedness of the two companies consisted mostly of the unpaid purchase price on certain West Virginia mines and that the burden could no longer be carried without "additional financing"; and suggesting, the majority of the stockholders and certificate holders of both companies having so "unanimously voted after full discussion," that "the only practical method of refinancing these companies is through reorganization." The letter also outlined the plan. The mortgagee bank thereupon foreclosed on the Maine Co's. mortgage on June 30, 1925, and at the foreclosure sale the new company, the proposed financial structure of which had been put before the stockholders of the old companies fully in the above mentioned circular letter, purchased the assets for $491,000 pursuant to the plan. The new company was the Low Volatile Coal Co. of Ohio, an Ohio company. The Ohio Co. issued 10,000 shares of preferred stock, to be sold at par; 10,000 more shares of common (no par value) to go as a bonus, share for share, with each share of preferred sold; and 10,000 shares more of common to be distributed to preferred stockholders of the old Maine Co. and to the minority stockholders of its subsidiary, the old West Virginia Co. Petitioner as a stockholder in the old Maine Co. thereby got 947 shares of the new Ohio Co's. no-par common stock (worth in 1925 about $40 a share) and seeks to show a loss in 1925 measured by the difference in value then of this stock and the cost of the stock held in the old Maine Co.

We are asked to say that this transaction was not "a reorganization" within the meaning of the 1926 Act, the relevant sections of which are set out in the margin.[2] The petitioner points out that

---

[2] Sec. 203. (h) As used in this section and sections 201 and 204—

(1) The term "reorganization" means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in contol of the corporation to which the assets are transferred, or (C) a recapitalization, or (D) a mere change in identity, form, or place of organization, however effected.

(2) The term "a party to a reorganization" includes a corporation resulting from a reorganization and includes both corporations in the case of an acquisition by one corporaton of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation.

(i) As used in this section the term "control" means the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

only about 68 percent of the new company's stock was owned after the transaction by stockholders of the two old companies, and that of the total shareholders of the old companies only about 80 percent owned stock in the new company. And it argues from this, under the statute's definition of "control" as 80 percent, that this was not a reorganization under section 203 (h) (1) (B). Conceding this without deciding it, the question remains whether this was not a reorganization under subsection (A) of the same provision. The petitioner contends that it does not fall within the definition of "merger or consolidation", but we think otherwise. Only recently, the Supreme Court had occasion to construe this section of the act, and said by way of definition, in *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U.S. 462:

> The paragraph in question directs—"The term 'reorganization' means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation)." The words within the parenthesis may not be disregarded. They expand the meaning of "merger" or "consolidation" so as to include some things which partake of the nature of a merger or consolidation but are beyond the ordinary and commonly accepted meaning of those words—so as to embrace circumstances difficult to delimit but which in strictness cannot be designated as either merger or consolidation. * * *

In that case there was the form of a sale by the old corporation to the new, and what is here important, a distribution of the cash proceeds of the sale (when realized through maturity of notes from the old corporation) to the stockholders of the old corporation. No such thing took place here. Here the new company paid $491,000 for all the assets of the old at the sale, but the only distribution made to the stockholders of the old company and its subsidiary was in stock of the new company. Moreover, such a distribution in the new company's stock was prearranged from the beginning, as the proposal to all stockholders of the two merged corporations made by the majority of such stockholders plainly shows there was a definite plan of reorganization which was carefully carried out.

It seems to us immaterial that there was a foreclosure sale of the old corporation's assets. Foreclosure sales are the common concomitant of reorganizations, and no peculiar significance, as petitioner contends, attaches to this circumstance; in fact, the judicial sale is the usual incident of reorganizations. Cf. *De Blois* v. *Commissioner*, 36 Fed. (2d) 11; *Cortland Specialty Co.* v. *Commissioner*, 60 Fed. (2d) 937; certiorari denied, 288 U.S. 599; Morawetz on Private Corporations, § 812. What is essential, however, to constitute a reorganization is continuity of interest from the old corporation into the new, and it is this element which distinguishes a reorganization from a mere sale by the old corporation of its assets

for cash and notes to be distributed to its stockholders in liquidation. *Cortland Specialty Co.* v. *Commissioner, supra; Pinellas Ice & Cold Storage Co.* v. *Commissioner, supra.* Here the petitioner was a stockholder in the old corporation and became, through a definite and prearranged plan, a stockholder in the new corporation, so that its continuity of interest remained unbroken. *Cullen F. Thomas,* 14 B.T.A. 1341, cited by petitioner, is distinguishable on its facts; and the peculiar facts of *Burnet* v. *Houston,* 283 U.S. 223, also relied on by petitioner, so far as we can see, have no application to the question at issue here. There a stockholder became a guarantor of the value of certain collateral held by his corporation and was allowed to take as a loss the difference between the amount so guaranteed and the stocks received on distribution of the collateral, the stocks received by the taxpayer having incidentally been substituted for that originally pledged to the corporation by its debtor through a reorganization. To state these facts is to show how remote that case is from the issue here.

In general legal parlance there was a reorganization, and we hold that there was also a reorganization within the meaning of the statute. Consequently, petitioner sustained no recognizable loss through its receipt in 1925 of the new Ohio Co.'s stock in exchange for the stock originally held by it in the old Maine Co. Cf. *Minnesota Tea Co.,* 28 B.T.A. 591.

3. One assignment of error remains which need not detain us long: The respondent's allocation of the cost equally between common and preferred shares of the stock bought by petitioner in 1927 in the new Low Volatile Coal Co. The petitioner bought in that year 739 shares of preferred stock of that company, paying approximately $103.66 a share. With each share of preferred, it received free as a bonus one share of common stock. The petitioner sold 54 shares of the Low Volatile Coal Co. preferred in 1928 at $5,346, or $99 a share.

The petitioner offered evidence of sales of the common stock in January 1926, at $22, and in December 1929, at $34 a share. It was certainly not worth more in 1927 than $40 a share, its probable value in 1925, and we have so found. It follows, therefore, that the preferred stock was then worth the difference between the amount paid for common and preferred, or about $63.66 a share. This basis of allocation of cost of the 739 shares of common and of preferred stock to petitioner in 1927, should, therefore, be followed, in the calculation of the gain on the 1928 sale.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

GOODRICH took no part in the consideration of or decision in this report.