CYRUS S. EATON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 86942. Promulgated April 15, 1938.

*Richard Inglis, Esq., I. W. Sharp, Esq., H. A. Mihills, C. P. A.,* and *L. C. Weiss, C. P. A.,* for the petitioner.
*T. M. Mather, Esq.,* for the respondent.

### OPINION.

MELLOTT: The Commissioner made several additions to the net income shown by petitioner's return for the year 1929 and determined a deficiency in his income tax for said year in the amount of $157,-882.69. Some of the additions are conceded to have been made properly. The petition alleges that the respondent (Commissioner) erred: (1) in increasing petitioner's taxable income by the addition of $427,343.75 representing the market value on December 3, 1929, of 12,500 shares of Central Alloy Steel Corporation common stock acquired by petitioner under the circumstances hereinafter related; (2) in disallowing the deduction from gross income, as a loss, of $1,287,536.15 claimed to have been sustained by the petitioner on the sale of certain securities on December 30, 1929; and (3) in disallowing $279,338.80 of a loss of $456,923.56 sustained by a partnership of which petitioner was a member, as a result of which he was prevented from taking his proportionate amount of the loss, or $117,322.30, as a deduction from his gross income.

All of the facts were stipulated. A resume of them will be sufficient for present purposes.

### ISSUE I.

Petitioner was a member of the partnership of Otis & Co., which was a dealer in securities with its principal office in Cleveland, Ohio. The partnership kept its books and made its returns of income on a calendar year basis.

During the latter part of the year 1929 the Central Alloy Steel Corporation, hereinafter called Alloy, acquired the property and assets of the Interstate Iron & Steel Co., hereinafter called Interstate, in exchange for shares of stock of Alloy, which Interstate then distributed among its stockholders. Alloy had entered into an agreement with Interstate on October 2, 1929, that it would "procure some firm or individual to enter into a binding agreement" with Interstate to purchase any shares of Alloy which the stockholders of Interstate should receive. Pursuant thereto Alloy entered into an agreement with Otis & Co. under which Otis & Co. agreed to purchase the Alloy stock, at $60 per share, if offered within two weeks after the ratification of the agreement by the stockholders of Interstate.

The contract between Otis & Co. and Alloy provided that Alloy, "as full compensation to the Dealer for undertaking and carrying out the purchase * * * and when the Dealer shall have fully performed its obligations to purchase stock offered to it" as provided by the agreement, should "issue to the Dealer Twelve Thousand Five Hundred (12,500) shares" of Alloy stock, fully paid and nonassessable.

Otis & Co. had been unwilling to assume on its own behalf and at its own risk the obligations involved in the above agreement and had executed it only at the request of petitioner and upon his written agreement, contained in a letter dated October 2, 1929, reading as follows:

You will agree to purchase at 60 Central Alloy stock from the Interstate stockholders offered you during the two weeks subsequent to the ratification of the merger, and scrip (if issued) at market until Jan. 1 next, all for my account, I to receive the compensation for this indemnity from Central Alloy.

The market value of Alloy stock at the time the agreement was made was approximately $54 per share. Pursuant to the agreement petitioner, through Otis & Co., purchased 79,687 shares of Alloy at $60 per share which, together with the 12,500 shares, made a total of 92,187 shares acquired by petitioner under the agreement.

The respondent treated the receipt of the 12,500 shares as a fee to petitioner for purchasing the 79,687 shares, the fee being computed upon the basis that the shares received had a fair market value of $34.1875 per share, or a total value of $427,343.75. Petitioner maintains that the sum paid out in acquiring the 79,687 shares—$4,781,220 —should be treated as the cost of the entire 92,187 shares.

Respondent argues that "in view of the plain and unambiguous terms of the agreement * * * that the stock was full *compensation* * * * for undertaking and carrying out the purchase" the fair market value of such stock must be held to be "compensation for personal service" and hence income to petitioner under section 22 (a) of the Revenue Act of 1928. Petitioner contends that the 12,500

shares "average down" his cost per share to an amount about equal to the actual value of the shares and that it is obvious that the agreement to purchase the shares at 60 would not have been made but for the fact that the contemporaneous agreement had been made under which he would receive more shares than those actually purchased. He contends that there is no difference in principle between the transaction before us and one in which a purchaser of preferred stock receives a "bonus" of common stock, in which case the total purchase price is, in the language of article 58 of Regulations 74, "* * * fairly apportioned between such common stock and the securities purchased for the purpose of determining the portion of the cost attributable to each class of stock or securities * * *." Cf. *C. H. Mead Coal Co.*, 28 B. T. A. 599.

It is, of course, well settled that compensation for personal service, though paid in the form of stock or securities, must be included in gross income to the extent of the fair market value of such property when received. *Marshall Field, Glore, Ward & Co.*, 16 B. T. A. 1299; affd., 47 Fed. (2d) 541; *Benedict Crowell*, 21 B. T. A. 849; affd., 62 Fed. (2d) 51; *Old Colony Trust Co. et al., Administrators*, 22 B. T. A. 1062; affd., 59 Fed. (2d) 168; *J. Kemp Bartlett*, 28 B. T. A. 285; affd., 71 Fed. (2d) 598; and *Adam H. Davidson*, 34 B. T. A. 479 affd., 91 Fed. (2d) 516. But is this rule applicable here?

In *James Brown*, 10 B. T. A. 1036, 1054, the petitioner was paid certain amounts to induce him to purchase some stock which the majority stockholder desired should be purchased by one friendly to the company. The Board held that the amount paid to the petitioner did not constitute income, but was a reduction of the cost of the stock. It was said that the two contracts—the agreement under which the additional amounts were paid and the purchase by him of the stock at a price which he considered too high—were to be "considered together upon the basis of the intent of the parties when made and in the light of the results reached in their final consummation", and that the amount so paid could not be "considered as taxable income."

The rule applied in the above case is not unlike the rule frequently applied in cases somewhat analogous. Thus, where different classes of securities are acquired in consideration of a lump sum, the profit is computed by allocating the cost between, or among, the securities purchased in the proportion that the fair market value of each class bears to the total fair market value of all classes. Cf. *Clifford Hemphill*, 25 B. T. A. 1351. In the case of stock dividends the cost of the original shares is allocated to the stock received and the original shares. *Silas H. Burnham*, 29 B. T. A. 605. In the sale of rights to subscribe to new issues of stock, such rights being "essentially analogous to a stock dividend", and in the case of the sale of stock acquired through the exercise of such rights, the gain or loss is to be computed

by, or after, an allocation of cost. *Miles* v. *Safe Deposit & Trust Co.*, 259 U. S. 247. While the facts in the cited cases are not entirely analogous to the facts in the instant proceeding, there is in our opinion sufficient similarity to justify the application of the same rule. It is therefore held that the respondent erred in treating the fair market value of the 12,500 shares of Alloy stock as income to the petitioner when they were received. Upon this issue petitioner is sustained.

Issue II.

Industrial Shares, Inc., is a corporation organized under the laws of the State of Delaware by a certificate of incorporation filed December 23, 1929, with an authorized capital stock of 1,000 shares of preferred stock of the par value of $100 each, with no voting rights, and 10,000 shares of common stock of the par value of $10 each, with full voting rights. One hundred shares of the common stock of said corporation were subscribed for by the incorporators. At a meeting of the incorporators held December 23, 1929, a board of directors consisting of three persons was elected. At a meeting of the board of directors held December 26, 1929, officers were elected and the treasurer of the corporation was authorized to accept subscriptions for, and to sell, the preferred shares of the corporation at their par value of $100 per share. The treasurer of the corporation, on December 28, 1929, in accordance with the authority previously given to him by the board of directors, received subscriptions from seven individuals for an aggregate of 250 shares of the preferred stock of the corporation at $100 per share and the cash received, or $25,000, was deposited to the credit of the corporation.

At a meeting of the board of directors of Industrial Shares, Inc., held December 30, 1929, the treasurer reported the sales of the preferred stock and the deposit of the sum of $25,000. Immediately following the report of the treasurer there was presented to the board of directors an offer from petitioner, contained in a letter dated December 30, 1929, addressed to the corporation and signed by petitioner, reading as follows:

I am the owner of the following shares of stock held by Otis & Co. of Cleveland, for me, which I am willing to sell at the respective prices set opposite the different items:

| | |
|---|---:|
| 1,000 shares of Central Alloy Steel Corporation common at $35.00 | $35,000.00 |
| 7,250 shares of Commonwealth Securities Incorporated common at $50.00 | 362,500.00 |
| 1,000 shares of Inland Steel Corporation common at $75.00 | 75,000.00 |
| 200 shares of Mesta Machine Company common at $200.00 | 40,000.00 |
| Total | $512,500.00 |

I am also the owner of 92,187 shares of Central Alloy Steel Corporation Common which is deposited with the Cleveland Trust Company of Cleveland, Ohio, under a certain Collateral Trust Agreement by and between Cyrus S. Eaton

and Otis & Co., First Parties, the Cliffs Corporation, Second Party, Continental Shares, Inc., Third Party, Commonwealth Securities, Incorporated, Fourth Party, and The Cleveland Trust Company, Fifth Party, to secure the payment of three notes of Cyrus S. Eaton guaranteed by Otis & Co., all dated December 3, 1929, and payable on or before one year after date, with interest at the rate of six per cent. (6%) per annum, to-wit:

| | |
|---|---:|
| Note to the order of Commonwealth Securities, Incorporated___ | $500, 000. 00 |
| Note to the order of Continental Shares, Inc_____ | 2, 087, 480. 00 |
| Note to the order of Cliffs Corporation_____ | 1, 100, 000. 00 |
| Total_____ | $3, 687, 480. 00 |

I am willing to sell said 92,187 shares of Central Alloy Steel Corporation so deposited with The Cleveland Trust Company at $35 per share or for an aggregate price of $3,226,545.00.

I hereby offer to sell, assign, transfer and set over to you all of the above mentioned shares of stock held by Otis & Co. and The Cleveland Trust Company for me at the prices above indicated, aggregating $3,739,045., to be paid by you in the following manner:

1—$3,687,480. by your assumption of the three notes to Commonwealth Securities, Incorporated, Continental Shares, Inc., and The Cliffs Corporation, aggregating that amount above referred to and your agreement to pay and perform all of my obligations and the obligations of Otis & Co. under said three notes and under the Collateral Trust Agreement securing the same above referred to.

2—The balance of $51,565. by crediting said amount on a subscription for 5,200 shares of your Common Stock of the par value of $10. each, which I hereby agree to make.

The balance of $435.00 necessary to make up the subscription price of $52,000. for 5200 shares of your Common Stock I will pay in cash.

You will assume the accrued interest on the notes above referred to and will be entitled to the full dividends on the stocks sold without accounting to me for any portion of the same.

I attach copies of the three notes dated December 3, 1929, and the Collateral Trust Agreement dated December 2, 1929 above referred to, for your information.

If you desire to accept this offer please indicate your acceptance on one of the duplicate copies hereof and return the same to me.

Petitioner's offer, as set forth in the above letter, was accepted by Industrial Shares, Inc., on December 30, 1929, and pursuant thereto he, on said date, assigned the securities to Industrial Shares, Inc., and acquired 5,200 shares of its common stock. This was the only common stock of Industrial Shares, Inc., ever issued or outstanding, except the 100 shares subscribed for by the incorporators, which 100 shares were assigned to the petitioner on January 3, 1930. Petitioner did not own any of the shares of preferred stock of Industrial Shares, Inc., at any time.

The securities which petitioner transferred to Industrial Shares, Inc., had, at the time of transfer, an aggregate market value of $3,342,832.06. Of that amount $2,906,269.56 was attributable to the stock of Alloy (92,187 shares at $31.1875) and the balance to the

stocks of Commonwealth, Inland, and Mesta. The liabilities of petitioner, which were assumed by Industrial Shares, Inc., amounted to $3,687,480.

The petitioner claimed a loss as the result of the above transaction in the amount of $1,287,536.15, computed as follows:

| Securities | Cost | Selling price | Gain or (loss) |
|---|---|---|---|
| 1,000 shares Alloy | $40,536.15 | $35,000 | ($5,536.15) |
| 92,187 shares Alloy | 4,781,220.00 | 3,226,545 | (1,554,675.00) |
| 200 shares Mesta Machine | 52,000.00 | 40,000 | (12,000.00) |
| 1,000 shares Inland Steel | 56,575.00 | 75,000 | 18,425.00 |
| 7,250 shares Commonwealth Securities | 96,250.00 | 362,500 | 266,250.00 |
| Total | 5,026,581.15 | 3,739,045 | (1,287,536.15) |

The claimed loss was disallowed by the respondent. He determined that it occurred in connection with the transfer by petitioner of his property (securities) to the corporation in exchange for its stock; that immediately after the exchange the persons transferring property to the corporation (including the original incorporators and the purchasers of its preferred stock) were in control of the corporation; and that the stock and securities in the corporation received by each was substantially in proportion to his interest in the corporation prior to the exchange. Thus, says the respondent, the transfer is one falling exactly within the provisions of section 112 (b) (5) of the Revenue Act of 1928, with the possible exception that the exchange by petitioner may not have been *solely* for stock or securities in the corporation since he also received, as part of the consideration for the transfer, the assumption of his indebtedness; but if this view be accepted, then no loss is to be recognized because of section 112 (e) of the Revenue Act of 1928. The applicable provisions are shown in the margin.[1]

---

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(a) *General rule.*—Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.

(b) *Exchanges solely in kind.—*

\* \* \* \* \* \*

(5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange.

\* \* \* \* \* \* \*

(e) *Loss from exchanges not solely in kind.*—If an exchange would be within the provisions of subsection (b) (1) to (5), inclusive, of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph to be received without the recognition of gain or loss, but also of other property or money, then no loss from the exchange shall be recognized.

\* \* \* \* \* \* \*

(j) *Definition of control.*—As used in this section the term "control" means the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

Petitioner contends that there was no exchange of property for stock, but that what occurred was a purchase of stock by the original incorporators and the holders of the preferred, after which the corporation purchased his property; that, even if it be held that there was an exchange of property so far as he is concerned, still no such holding can be made relative to the acquisition of the stock by the original incorporators and the preferred stockholders; that in any event the control of the corporation, as required by the statute and as such term has been interpreted by court and Board decisions, has not been shown to exist; that the rule enunciated and applied by the court in *Halliburton* v. *Commissioner*, 78 Fed. (2d) 265, and relied upon by the respondent in making his determination, is unsound and should not be followed; that even if there were an exchange, the persons did not receive stock substantially in proportion to their interest in the property prior to the exchange as required by section 112 (b) (5), *supra;* and that in any event the respondent erred in construing the assumption by the corporation of petitioner's indebtedness to be "other property" within the purview of section 112 (e).

The first question is whether the transaction was a sale or an exchange. Petitioner on brief argues that inasmuch as his offer was "in terms an offer to *sell* the securities and not an offer to exchange them for stock in Industrial Shares, Inc.", it must necessarily be found that he made an outright sale rather than an exchange as determined by the respondent. His argument, however, is not persuasive. "The terminology used by the parties * * * is not conclusive." *National Grange Mutual Liability Co.*, 31 B. T. A. 666, 670; affd., 80 Fed. (2d) 316. Petitioner transferred to the corporation certain securities and $435 in cash and received from the corporation 5,200 shares of its common stock and the right to be relieved of an indebtedness. The word "property" as used in section 112 (b) (5), *supra*, includes money paid for stock. *Halliburton* v. *Commissioner*, 78 Fed. (2d) 265. There was therefore a transfer of property for property. Such a reciprocal transfer is an exchange.

It must next be determined whether this exchange falls within the provisions of section 112 (b) (5), *supra*. If it does, petitioner is not entitled to the deduction of the claimed loss, and if it does not, the claimed loss is an allowable deduction unless the exchange is within the provisions of section 112 (e), *supra*, also relied upon by the respondent. In order for the transaction to come within the provisions of subdivision (b) (5) there must be (1) a transfer of property to a corporation by one or more persons solely in exchange for stock or securities in such corporation; (2) immediately after the exchange such person or persons must be in control of the corporation; and (3) in the case of an exchange by two or more persons

the stock or securities received by each must be substantially in proportion to his interest in the property prior to the exchange.

If the transfer made by petitioner is to be considered alone, it is clear that it is not within the provisions of section 112 (b) (5); for immediately after the exchange he was not in control of the corporation. "Control" means the ownership of at least 80 percent of the voting stock and at least 80 percent of the total number of shares of all other classes of stock. Sec. 112 (j), *supra*. Immediately after the exchange the corporation had outstanding 5,300 shares of common and 250 shares of preferred stock. Petitioner, not being the owner of any preferred stock, did not have the control required by the statute.

Respondent's disallowance of the claimed loss is not bottomed, however, solely on the transfer made by petitioner. It is his position that two or more persons, namely, the petitioner and those who acquired the preferred stock, transferred property to the corporation, consisting of securities and cash, and received in exchange stock and other property, the latter being the indebtedness of petitioner assumed by the corporation. It would serve no useful purpose to discuss or decide whether the stipulated facts warrant his conclusion that the transfers were all a part of one transaction or plan. Certainly, the short period of time elapsing between the organization of the corporation and the completion of the transfers tends to support this conclusion. We prefer, however, to rest our decision on another ground, and it may be assumed that the transfers were made pursuant to a plan devised by petitioner and the others. Inasmuch as the transferors immediately after the transfers owned all of the stock of the corporation, they had the necessary control required by the statute. But this holding does not justify the disallowance of the claimed loss.

Under the provisions of section 112 (b) (5), *supra*, the loss must be allowed as a deduction unless "the amount of the stock * * * received by each [of the transferors] is substantially in proportion to his interest in the property prior to the exchange." This clause requires a comparison "between the value of the share of each transferor in the total assets before the exchange and the value of its shares of stock or interest in the corporation after the exchange." *United Carbon Co.* v. *Commissioner*, 90 Fed. (2d) 43. See also *Edwin L. Dana*, 36 B. T. A. 231; *Samuel E. Diescher*, 36 B. T. A. 732. If, therefore, there was a substantial difference between the value of the asset possessed by each transferor prior to the exchange and the value of the stock received by him through the exchange, the transaction does not fall within the provisions of subdivision (5).

Immediately prior to the exchange petitioner had securities the market value of which at the time of the transfer has been stipulated

to be $3,342,832.06. This amount, and not the sum of $3,739,045, which Industrial Shares, Inc., agreed to pay for them, represents the value of the securities transferred to the corporation by petitioner. These securities were subject to an indebtedness of $3,687,480. Petitioner transferred the securities and $435 in cash to Industrial Shares and received 5,200 shares of its common stock, and the corporation assumed the indebtedness of $3,687,480. Other persons transferred to the corporation $25,000 in cash and received 250 shares of preferred stock. It is apparent from the foregoing that petitioner and the preferred stockholders did not receive stock substantially in proportion to their interests in the aggregate of property prior to the exchange. The value of the share of the preferred stockholders in such aggregate of property transferred was $25,000, while the value of the shares of petitioner was nothing at all. After the transfers the value of the shares or interest in the corporation of both petitioner and the preferred stockholders was nothing, inasmuch as the indebtedness of the corporation was approximately $300,000 in excess of the value of all of its assets. Under these circumstances it must be held that the transferors did not receive stock which was substantially in proportion to their interests in the property prior to the exchange, and recognition of the loss sustained is not barred by the provisions of section 112 (b) (5), *supra*. Moreover, such recognition is not barred by the provisions of section 112 (e), *supra*, also relied upon by the respondent, as this section has no application unless the amount of the stock received by each transferor is substantially in proportion to his interest in the property prior to the exchange.

The respondent erred in disallowing the claimed loss.

ISSUE III.

During 1929 petitioner was a member of a partnership called Otis & Co., a dealer in securities. As of September 1, 1929, F. E. Eberstadt became a member of the firm, with an interest of 10 percent in its profits and losses. He contributed $1,600,000, which included securities for which he had paid $1,130,482.08 but were accepted by the partnership on that date at their fair market value of $1,555,362.50. On the records of the partnership an amount of $14,428.09 representing inter-office interest (contra credit on which was included as interest income in computing taxable income of the partnership) was added to market value of the securities contributed by Eberstadt, making a total of $1,569,790.59.

Some of the securities contributed by Eberstadt were disposed of prior to December 31, 1929, for $780,810. The remaining securities were included in the closing inventory of Otis & Co., of December 31, 1929, at a value of $332,157.03 and a loss of $456,923.56 was thus computed by the partnership. The petitioner's distributive share of the

profits of the partnership was 42 percent and his aliquot part of the loss sustained was $191,907.90.

The respondent disallowed $279,338.80 of the loss claimed by the partnership and hence in effect disallowed $117,332.80 of the deduction of $191,907.90 claimed by petitioner in his return of income for said year. The respondent computed the loss to the partnership as follows:

| | | |
|---|---|---|
| Inventory value of securities on hand 12–31–29 | | $332,057.03 |
| Eberstadt cost of securities contributed | $1,130,482.08 | |
| "       "       "       " sold | 620,840.29 | |
| "       "       "       " on hand 12–31–29 | | 509,641.79 |
| Allowable loss | | $177,584.76 |
| Loss per books | | 456,923.56 |
| Loss disallowed | | $279,338.80 |

The above basis of $509,641.79 was computed as follows:

| | | |
|---|---|---|
| Eberstadt's cost of securities | | $1,130,482.08 |
| "       "       " sold | | 620,840.29 |
| "       "       " on hand Dec. 31, 1929 | | $509,641.79 |

Upon this issue, therefore, the question is whether the loss of $456,923.56 claimed by the partnership should be allowed, or whether only $279,338.80 should be allowed.

The petitioner contends that the fair market value of the securities contributed to the partnership at the date of contribution, at which value they were accepted by the partnership, is the proper basis to be used in the determination of gain or loss. This question has heretofore been considered by this Board and by the courts, and if the decisions in those cases are followed judgment must be for the petitioner on this issue. See *Edward B. Archbald*, 27 B. T. A. 837; affd., 70 Fed. (2d) 720; certiorari denied, 293 U. S. 594; *Carroll E. Donner*, 32 B. T. A. 364; *Helvering* v. *Walbridge*, 70 Fed. (2d) 683; certiorari denied, 293 U. S. 594; *Chisholm* v. *Commissioner*, 79 Fed. (2d) 14; certiorari denied, 296 U. S. 641.

Upon brief respondent states that he is cognizant of the above decisions and of the fact that they are contrary to his present contention. He, though citing no authorities in support of his view, states simply that he does not agree with the decisions and, as stated by him in XIV–1 C. B. 208, he declines to follow them "pending the outcome of further litigation of the question involved." The Board is of the opinion, however, that the above decisions are correct and should be followed.

It is unnecessary to discuss this question at length or to repeat what was said in the above cases. An amendment was made to the revenue act in 1934 under which, in effect, the rule contended for by

the respondent in the instant proceeding is applicable to later years. Section 113 (a) (13) of the Revenue Act of 1934 provides that if property is acquired by a partnership, its basis shall be the same as it would be in the hands of the transferor. If, therefore, the present controversy were under the Revenue Act of 1934 or a later year, the cost or other basis to the partnership would be the same as the cost or basis in the hands of the contributing partner. But Congress did not attempt to make the above legislation retroactive. On the contrary, it stated (sec. 1, Revenue Act of 1934) that the provisions of the title, which included section 113 (a) (13), *supra*, should "apply only to taxable years beginning after December 31, 1933." A law will not be given retroactive effect unless the intention that such effect should be given is made clear by the act itself. Cf. *Brewster* v. *Gage*, 280 U. S. 327; *United States* v. *Magnolia Petroleum Co.*, 276 U. S. 160; *Schwab* v. *Doyle*, 258 U. S. 529.

On this issue the action of the respondent is disapproved.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*