## BURR OAKS CORPORATION, ET AL.,[1] PETITIONERS, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4771–62, 4772–62, 1581–63, 1583–63. Filed February 11, 1965.

*Thomas J. Donnelly, Jr., Samuel J. Recht, Herbert Morse,* for the petitioners.

*Denis J. Conlon,* for the respondent.

FAY, *Judge:* Respondent, pursuant to a statutory notice of deficiency, determined deficiencies in the income tax of petitioner Burr Oaks Corp. for its taxable years ended September 30, 1958, 1959, and 1960, in the respective amounts of $15,067.26, $52,595.26, and $16,602.61. With regard to the various individual petitioners, respondent determined the following deficiencies in their respective income taxes:

| Docket No. | Petitioners | Taxable year ended Dec. 31— | Deficiency |
|---|---|---|---|
| 4772–62 | A. Aaron and Rosella Elkind | 1958 | $499.32 |
| | | 1959 | 35,520.49 |
| | | 1960 | 1,778.90 |
| 1581–63 | Harold A. and Fannie G. Watkins | 1959 | 30,386.55 |
| 1583–63 | Maurice and Esther Leah Ritz | 1959 | 37,702.90 |

[1] Proceedings of the following petitioners are consolidated herewith: A. Aaron Elkind and Rosella Elkind, docket No. 4772–62; Harold A. Watkins and Fannie G. Watkins, docket No. 1581–63; and Maurice Ritz and Esther Leah Ritz, docket No. 1583–63.

Petitioner Burr Oaks Corp. will hereinafter be referred to as the petitioner, and petitioners A. Aaron Elkind, Harold A. Watkins, and Maurice Ritz will hereinafter sometimes be referred to respectively as Elkind, Watkins, and Ritz, or as the individual petitioners.

The only question [2] remaining to be determined insofar as petitioner is concerned is its correct basis in certain unimproved real estate transferred to it by Elkind, Watkins, and Ritz. In order to make this determination, we must first decide whether the transfer by Elkind, Watkins, and Ritz to petitioner constituted a valid sale or a contribution to capital. In the event we find it to be the latter, we must further determine whether it constitutes a transfer to a controlled corporation within the meaning of section 351.[3]

Insofar as petitioners Elkind, Watkins, and Ritz are concerned, we must determine whether certain amounts received by them during 1959 from petitioner were taxable as ordinary income, rather than as long-term capital gain.[4]

### FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Petitioner is a corporation formed under the laws of the State of Wisconsin. It maintains its books of account and files its Federal income tax returns on the basis of an accrual method of accounting and a fiscal year ended September 30. It filed its Federal income tax returns for its fiscal years ended September 30, 1958 through 1960, with the district director of internal revenue at Milwaukee, Wis.

A. Aaron and Rosella Elkind were, at all times relevant hereto, husband and wife. They filed joint Federal income tax returns for 1958, 1959, and 1960, prepared on the basis of a calendar year and the cash method of accounting, with the district director of internal revenue at Milwaukee, Wis.

Harold A. and Fannie G. Watkins were, at all times relevant hereto, husband and wife. They filed a joint Federal income tax return for 1959, prepared on the basis of a calendar year and the cash method of accounting, with the district director of internal revenue, Milwaukee, Wis.

---

[2] Respondent has conceded that certain costs incurred by petitioner should be allowed as current costs of sales rather than be allocated to several years as they were treated in the notice of deficiency. Petitioner has conceded that certain gains from the sale of lots, which it reported as received during its taxable year 1960, were properly reportable during its taxable year 1959. Petitioner's only contention with regard to those sales is that its basis for the lots sold should be higher than that determined by respondent.

[3] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as it existed during the taxable years in issue.

[4] All other issues raised by the individual petitioners in their pleadings have been settled pursuant to agreement between the parties or have been conceded or abandoned.

Maurice and Esther Leah Ritz were, at all times relevant hereto, husband and wife. They filed a joint Federal income tax return for 1959, prepared on the basis of a calendar year and the cash method of accounting, with the district director of internal revenue at Milwaukee, Wis.

Elkind, at all times relevant hereto, has been engaged in various aspects of real estate development, with primary emphasis on the development of tracts of one-family houses. These various endeavors were generally conducted through corporations in which Elkind or members of his family were majority stockholders. Elkind also has made a number of investments in real estate, including raw land as well as improved property producing rental income.

Ritz, at all times relevant hereto, was a certified public accountant and the senior partner of an accounting firm of which Elkind was a client. Ritz had made various investments in improved and unimproved real estate prior to the years in issue herein, primarily as a result of opportunities which he came across in connection with his accounting practice.

At all times relevant hereto, Watkins was the president and principal stockholder of a corporation engaged in the manufacture and sale of slippers and other types of casual footwear. Watkins, also, had made several investments in real property over the years, primarily in improved properties producing rental income.

Elkind, Watkins, and Ritz have, at least upon one occasion other than that involved herein, jointly invested in a relatively large tract of unimproved real estate. Thus, on June 4, 1953, they purchased for the sum of $70,124.15 a tract of undeveloped land located just outside the city of Madison, Wis. These individuals held that property (hereinafter referred to as the Gay Farm) jointly until April 20, 1954, at which time it was sold to one of Elkind's development corporations for the sum of $149,650.79. That corporation subdivided the property into 353 lots, constructed one-family homes thereon, and made substantial profits totaling approximately $500,000 upon their sale.

In the fall of 1954 Elkind came across the opportunity to purchase a similar piece of property, this time a tract of land of approximately 70 acres, also located near the outskirts of the city of Madison and theretofore used as a golf course. This property will hereinafter sometimes be referred to as the Burr Oaks property.

Elkind, in December of the same year, contacted Ritz and Watkins in regard to their participation with him in the purchase of that land. Watkins and Ritz agreed to join him in the acquisition upon the understanding that each of them would obtain a one-third interest therein. On December 7 of that year, Elkind tendered to the owner

of said property a written offer to purchase the property for the sum of $100,000. The offer provided that $10,000 of the purchase price was payable at the time of acceptance, $10,000 on February 15, 1955, $5,000 on April 1, 1955, with payments of $5,000 due quarterly thereafter until the final balance was paid. The offer was accepted on December 8, 1954.

From the time they acquired the Burr Oaks property through the summer of 1957 Elkind, Watkins, and Ritz attempted to develop said property as a shopping center site or as an industrial park. In furtherance of this plan, they purchased in 1955 an additional 80 feet of frontage on an adjoining thoroughfare for the purpose of providing better access to the Burr Oaks property in the event of its commercial development. This 80 feet of frontage will hereinafter be referred to as the Brinkman property. Their efforts to develop the Burr Oaks property for commercial purposes, however, proved fruitless.

Sometime during 1957 Elkind became convinced that their plans to develop the Burr Oaks property as a shopping center or an industrial park would not materialize. Contemplating that one of his corporations might purchase the property for purposes of subdivision or development, Elkind requested two of his business associates to investigate the zoning and platting possibilities of the Burr Oaks property. On March 11, 1957, a petition was filed with the City Council of Madison, Wis., to change the zoning of the Burr Oaks property from residential A (single-family dwellings) to residential A2 and B (two-family and four-family dwellings) and commercial A and B.

Elkind then proposed to Watkins and Ritz that the three of them sell the Burr Oaks property to one of Elkind's real estate corporations, as they had done with the Gay Farm property. Watkins and Ritz, recalling the substantial profits made by Elkind's corporation after they had sold the Gay Farm property to it, rejected this proposal. Ritz suggested that the three of them transfer the Burr Oaks property to a corporation which they would form for the purpose of subdividing, developing, and selling the property; that the shareholders thereof would be comprised of his two brothers and the wives of Watkins and Elkind; and that in return for the transfer of the land, the corporation would issue promissory notes to Elkind, Watkins, and Ritz. It was agreed that they would follow Ritz' suggestions.

On September 9, 1957, the City Council of Madison approved a preliminary plat incorporating the zoning proposed for the property in the aforementioned petition filed on March 11, 1957. The land as platted contained 89 lots zoned for single-family dwellings (residen-

tial A); 65 lots zoned for four-family apartments (residential B); 110 lots zoned for multiple-family apartments (residential C); 1 site zoned for commercial use; and 1 site zoned for a school. This zoning received final approval from the Madison City Council on November 25, 1957.

Petitioner was incorporated on October 8, 1957, for the purpose of (1) acquiring the Burr Oaks property from Elkind, Watkins, and Ritz; (2) developing and subdividing said property; and (3) selling improved lots therefrom to customers. At the time petitioner was formed, the Burr Oaks property was completely unimproved. Elkind, Watkins, and Ritz were aware of a local ordinance pursuant to which owners of unimproved land could request the city of Madison to make improvements thereon such as streets, sewers, water, and sidewalks. The city would make these improvements and assess the costs incurred in connection therewith against the property. However, it was realized that the cost of some of the improvements to be made, such as grading and supplying crushed stone, would have to be borne directly by the developers. The total cost of such improvements, as estimated by petitioner, was in the amount of $107,243.33.

It was determined by Ritz, Watkins, and Elkind that petitioner's initial capital would be $4,500.

Petitioner issued a total of 450 shares of its common stock to a group composed of Elkind's wife, Watkins' wife, and Ritz' brothers, Philip and Erwin, for an aggregate consideration of $4,500. Elkind's wife received 150 shares of the stock; Watkins' wife also received 150 shares; and Philip and Erwin Ritz each received 75 shares. The record does not indicate the exact date when this stock was issued. Philip and Erwin Ritz paid for their stock by their respective checks, each in the amount of $750 and dated October 9, 1957. Watkins' wife paid for her stock by a check in the amount of $1,500 dated October 14, 1957. Each of the above-mentioned four persons received from petitioner a receipt dated November 1, 1957, evidencing their payment for the stock. At all times relevant hereto, petitioner's stockholders of record and officers and directors were as follows:

| Shareholder | Number of shares held | Officers | Position held | Directors |
|---|---|---|---|---|
| Rosella Elkind (Elkind's wife) | 150 | Watkins | President. | Watkins. |
| Fannie G. Watkins (Watkins' wife) | 150 | Philip M. Ritz | Vice president. | Ritz. |
| Philip M. Ritz (Ritz' brother) | 75 | Rosella Elkind | Secretary-treasurer. | Elkind. |
| Erwin M. Ritz (Ritz' brother) | 75 | | | Fannie G. Watkins. Philip M. Ritz. Rosella Elkind. |

Petitioner's articles of incorporation, at all times relevant hereto, provided:

(c) Any stock that is hereafter issued by the corporation may be sold to such persons and at such prices but not less than such prices as may be determined by the majority of the Board of Directors, and without first offering any part of said stock to the then present holders of stock in the corporation:

On November 1, 1957, Elkind, Watkins, and Ritz transferred their respective interests in the Burr Oaks property to petitioner. In consideration for this transfer, petitioner assumed the remaining unpaid balance for the property, namely $30,000, and issued to each of Elkind, Watkins, and Ritz what purported on the face thereof to be a promissory note in the principal amount of $110,000. Each of the notes recited that it bore interest at the rate of 6 percent and that it was payable 2 years after the making thereof. The $30,000 obligation for the Burr Oaks property to its original owner, assumed by petitioner from Elkind, Watkins, and Ritz, was entered on petitioner's books under an account captioned "Mortgage Payable." An additional account was set up under the title "Land Contract Payable" in the amount of $330,000 to represent the alleged promissory notes. At the time Elkind, Watkins, and Ritz transferred the Burr Oaks property to petitioner, the fair market value of said property was substantially less than $360,000. The property was not worth more than $165,000 at that time.

Although at the time Elkind, Watkins, and Ritz transferred their interests in said property to petitioner they hoped that petitioner's business would be successful, petitioner's prospects were uncertain. The nature of their investment can best be described by the term "speculative."

Shortly after its incorporation, petitioner found that it did not have sufficient funds on hand with which to commence operations. Therefore, on November 30, 1957, it borrowed $15,000 from Elkind. On February 28, 1958, Elkind loaned petitioner an additional $10,000. These loans, together with interest thereon in the amount of $1,859.78, were repaid on June 30, 1959.

None of petitioner's stockholders of record, namely Watkins' and Elkind's respective wives and Ritz' brothers, took any active interest in the management of petitioner. In fact, none of them had any real idea of the nature of petitioner's business, other than some vague notion that it was engaged in "real estate" in some way or other.

Watkins and Ritz hired Albert McGinnes to manage petitioner. His work included the supervision of the platting, development, and subdivision of the land, as well as taking charge of advertising and sales. McGinnes had known and worked for Elkind and his various

corporations for approximately 15 years prior to that time as a lawyer and real estate broker and in various other capacities. McGinnes, moreover, was the person who first interested Elkind in purchasing the Burr Oaks property and checked into the zoning and platting possibilities for the land. During the years in issue, McGinnes continued to work for various Elkind interests.

Ritz' accounting firm, Ritz, Holman & Co., kept petitioner's books and took care of its accounting work. McGinnes was required to account to Ritz, Holman & Co. for the funds which he took in and disbursed in connection with his operation of petitioner's business.

Upon a number of occasions, petitioner transferred various lots or parcels of property to Elkind, Watkins, and Ritz, either at no cost or at a price less than the amount for which such lots could have been sold to third parties. Thus, by deed dated November 3, 1958, petitioner conveyed to Elkind, Watkins, and Ritz a strip of commercial property, 70 feet by 120 feet, located in the southeast corner of the Burr Oaks property. This property was contiguous with another piece of commercial property, the Brinkman property, which Elkind, Watkins, and Ritz had purchased when they were contemplating using Burr Oaks for a shopping center. Nothing was paid to petitioner in consideration for this transfer. The deed by which the transfer was effected purported on its face to correct an erroneous conveyance of the land to petitioner in the first place.

On November 14, 1958, petitioner sold five lots at a price of $3,000 per lot to the Leo Building Corp., which was owned and controlled by Elkind and an associate of his. On the same date petitioner sold an additional five lots for the same price to Carsons, Inc., a corporation owned by Watkins. Petitioner, on May 20, 1960, sold five more lots at $3,000 per lot to M & L Investment, Inc., a corporation in which Ritz owned a substantial interest. Each of the lots involved in these transfers was zoned residential B to accommodate four-family apartments. The evidence indicates that, at the time they were sold after having been platted, subdivided, and improved, each of these lots could have been sold to outsiders for $500 to $1,000 more than was received from the above corporations. None of petitioner's shareholders of record (Philip and Erwin Ritz, Elkind's wife, or Watkins' wife) was consulted with regard to, or knew of, any of these transfers. Nor was any such transfer authorized by a meeting of petitioner's board of directors.

Although McGinnes was in charge of petitioner's day-to-day operations, Elkind, Watkins, and Ritz controlled and dominated petitioner's affairs.

During its taxable years 1958 through 1963, inclusive, petitioner had gross receipts in the following amounts as a result of its subdivision and sale of the Burr Oaks property:

| Taxable year ended Sept. 30— | Gross sales of lots |
|---|---|
| 1958 | $86,095 |
| 1959 | 177,200 |
| 1960 | 118,625 |
| 1961 | 68,250 |
| 1962 | 49,400 |
| 1963 | 13,900 |
| Total | 513,470 |

As had been contemplated by Elkind, Watkins, and Ritz at the time of petitioner's incorporation, improvements to the Burr Oaks property, such as streets, sewers, water, and sidewalks, were made by the city of Madison. The city was to recover the cost of these improvements by special assessments against the lots, which assessments were generally payable over a period of 5 to 8 years. To the extent that installments of the special assessments came due prior to the sale of the lots, they were paid by petitioner and added to the price of the lots. To the extent the assessments had not been paid prior to the sale of the lots, they were assumed by the purchaser. Certain costs incurred in connection with the subdivision and improvement of the Burr Oaks property were borne directly by petitioner. These costs included the following: (1) The cost of installing a sewer along one of the streets in the subdivision; (2) a surveying fee running from $25 to $40 per lot; and (3) the costs of grading and supplying crushed stone. The cost of improvements incurred by petitioner in subdividing the Burr Oaks property, including the special assessments paid by it, totaled $107,243.33.

In addition to the foregoing costs, petitioner during its taxable years ended September 30, 1958, through September 30, 1963, incurred the following operating expenses in connection with its subdivision and sale of the Burr Oaks property:

| Taxable year ended Sept. 30— | Amount |
|---|---|
| 1958 | $21,281.61 |
| 1959 | 22,077.74 |
| 1960 | 20,217.49 |
| 1961 | 20,650.46 |
| 1962 | 21,182.44 |
| 1963 | 15,500.14 |

In the latter part of 1959 Elkind, Watkins, and Ritz surrendered to petitioner the original "promissory notes" which they had received from petitioner in connection with their transfer of the Burr Oaks property. In return for the surrender of the notes, each of the individ-

ual petitioners received from petitioner a distribution of $23,000 in cash and a promissory note dated November 1, 1959, in the principal amount of $87,000. The new notes recited (1) that they were payable 1 year after the making thereof and (2) that they bore interest at the rate of 6 percent per annum. Later that same year, petitioner paid an additional $8,000 apiece to Elkind, Watkins, and Ritz. Petitioner at that time, in exchange for each of their notes in the principal amount of $87,000, issued to each of them a new promissory note in the principal amount of $79,000.

On December 29, 1959, petitioner purported to repay the outstanding balance on these "new promissory notes." At the close of business on that date petitioner had a bank balance of $5,398.88. The record does not clearly indicate how petitioner purported to repay these notes. However, the record does clearly indicate that petitioner urgently needed as working capital the $237,000 which it claims to have used to repay the three promissory notes. Therefore, immediately after those notes were "repaid," Elkind, Watkins, and Ritz each "loaned" $79,000 to petitioner, and petitioner, in turn, issued to each of the individual petitioners a "new" 1-year promissory note dated December 31, 1959, in the principal amount of $79,000. This transaction did not represent a repayment of the alleged "promissory notes." It was merely an extension of the purported maturity date. The individual petitioners never had any intention of enforcing their "notes" against petitioner.

In addition to the foregoing, petitioner made the following distributions to each of the individual petitioners with regard to the "promissory notes":

| Date of distribution | Amount paid to each of the individual petitioners |
| --- | --- |
| Aug 31, 1960 | $8,000 |
| Jan. 31, 1961 | 15,000 |
| Dec. 31, 1961 | 10,000 |

There was an aggregate balance of $138,000 outstanding upon the three "notes" at the time of the trial in this proceeding, or a total of $46,000 due upon each of said notes.

Petitioner has not distributed any of its earnings to any of the shareholders of record.

Elkind, Watkins, and Ritz treated their transfer of the Burr Oaks property to petitioner in November 1957 as a sale. Petitioner did likewise and set up on its books a cost of $360,000 for said property. Elkind, Watkins, and Ritz, however, did not report any gain with regard to this alleged sale until 1959 when petitioner purportedly paid in full the promissory notes which it had issued to them in connection with said transfer. In their respective income tax returns for 1959,

each of them reported long-term capital gain in the amount of $85,-729.06 as a result of their transfer of the Burr Oaks property to petitioner in 1957.

Respondent, pursuant to separate notices of deficiency issued to Elkind, Watkins, and Ritz with respect to their taxable year ended December 31, 1959, determined that—

the gain realized from the sale of * * * [the Burr Oaks property] in the total amount of $85,729.06 is taxable as ordinary income rather than as long-term capital gains reported on your income tax return. * * *

Pursuant to a statutory notice of deficiency issued to petitioner with respect to its taxable years 1958 through 1960, respondent increased petitioner's taxable income for said years by an aggregate amount totaling $192,686.98. This increase was based on respondent's determination that petitioner had understated its income for those years by claiming too high a basis or cost in the land sold by it in that period. The notice of deficiency indicates that, in making his determination, respondent treated petitioner as having a basis of $100,-000 in the Burr Oaks property, rather than a basis of $360,000, as petitioner had claimed.

## OPINION

There are two issues to be determined in this case. These are (1) petitioner's correct basis in the Burr Oaks property and (2) the proper tax treatment of the amounts received by Elkind, Watkins, and Ritz from petitioner during 1959. In order to resolve these issues, we must classify, for tax purposes, the transaction wherein each of the individual petitioners in November 1957 (1) transferred his respective interest in the Burr Oaks property to petitioner and (2) in return therefor received an instrument purporting to be a promissory note in the principal amount of $110,000.

It is contended by Elkind, Watkins, and Ritz (1) that their transfer of the Burr Oaks property to petitioner constitutes the sale or exchange of a capital asset held in excess of 6 months; (2) that the promissory note received by each of them in return therefor represents a valid indebtedness incurred by petitioner; and (3) that the gain realized by them in connection with said transfer is properly reportable in 1959 when they allege that petitioner "paid in full" the "promissory notes" which had been issued to them.[5]

---

[5] Passing over for the moment the validity of the first two parts of the individual petitioners' argument, we believe it appropriate to point out that the third part of their argument, namely, that the gain realized by them on the transfer of the Burr Oaks property was properly reportable in 1959, is incorrect. Watkins, Elkind, and Ritz at all times relevant hereto were cash basis taxpayers. When cash basis taxpayers sell property, they must include in income the fair market value of any property received in exchange therefor. This would include the fair market value of any notes received. See *Pinellas Ice Co.* v. *Commissioner,* 287 U.S. 462 (1933). The individual petitioners have not ad-

It is contended by petitioner that it purchased the Burr Oaks property from Elkind, Watkins, and Ritz at a cost of $360,000 and that such cost is its correct basis in said property.

The plethora of arguments advanced by respondent in his opening statement and on brief indicates to us that the Government had some difficulty in formulating a suitable rationale under which to classify the transfer of the Burr Oaks property to petitioner. It would serve no purpose to set forth at this point the various contentions made by respondent since we believe that the transaction was not a sale, but an equity contribution.[6]

It is true that Elkind, Watkins, and Ritz attempted to cast their transfer of the Burr Oaks property to petitioner in the form of a sale. It is also true that, from a standpoint of form, the alleged promissory notes issued to the individual petitioners are clear evidences of indebtedness. However, it has often been noted in connection with similar issues, the substance of the transaction, rather than its form, is the controlling factor in the determination of the proper tax treatment to be accorded thereto. *Sherwood Memorial Gardens, Inc.*, 42 T.C. 211 (1964), on appeal (C.A. 7, Aug. 10, 1964) ; *1432 Broadway Corporation*, 4 T.C. 1158 (1945), affd. 160 F. 2d 885 (C.A. 2, 1947). Whether a transaction such as the one we are now confronted with is in substance, as well as in form, a sale is essentially

vanced any of the arguments which would enable them to avoid the applicability of this general rule. Thus, they have made no argument that the "promissory notes" received by them were of indeterminate or unascertainable value or that the notes were not received by them in payment for the land. Cf. *Robert J. Dial*, 24 T.C. 117 (1955) ; *Jay A. Williams*, 28 T.C. 1000 (1957) ; and *Schlemmer v. United States*, 94 F. 2d 77 (C.A. 2, 1938). Nor do they contend (1) that the fair market value of the "notes" received by them was less than their respective bases in the land, cf. sec. 1.1001–1, Income Tax Regs., or (2) that the transfer was not a closed transaction, cf. *Joseph Marcello*, 43 T.C. 168 (1964). There is nothing in the record to show that (1) they elected to report the gain realized by them at the time of the transfer on the installment method or (2) that they were entitled to report their gain on the deferred payment sale method. See sec. 1.453–4(b)(1) and (2) and sec. 1.453–6, Income Tax Regs.

[6] The statutory notices issued to the individual petitioners seem to be grounded on the theory that Elkind, Watkins, and Ritz were not entitled to report the sale of the Burr Oaks property as long-term capital gain since they were dealers. The deficiency notices did not raise any question with regard to the proper year for reporting the gain. In view of the fact that respondent, in the deficiency notice to petitioner-corporation, determined that petitioner's basis for the Burr Oaks property was the same as that of the transferors of the property, said statutory notice would seem to be based on the theory that the transfer was governed by sec. 351. This is undoubtedly what caused Elkind, Watkins, and Ritz to raise the following issue by way of amended petition: "In the alternative, in the event the basis of the * * * [Burr Oaks property] in the hands of * * * [petitioner] is determined under section 351 of the Internal Revenue Code, respondent erred in failing to determine that petitioners had no taxable gain for the year 1959 as a result of the transfer of the said real estate to * * * [petitioner]."

We have concluded that the transfer of the Burr Oaks property to petitioner was not a sale on the basis of the clear, uncontroverted facts in the record and without resort to the burden of proof. Nevertheless, we believe it appropriate to point out that the petitioners Elkind, Watkins, and Ritz, as well as the Burr Oaks Corp., have the burden of proof on this issue. For even if we were to regard the issue of whether the transfer of the property constitutes a bona fide sale as new matter insofar as Elkind, Watkins, and Ritz are concerned, they raised that question by way of their amended petition.

a question of fact. *Gooding Amusement Co.*, 23 T.C. 408 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956), certiorari denied 352 U.S. 1031 (1957).

As we view the creditable evidence presently before us, the transfer of the Burr Oaks property to petitioner is so lacking in the essential characteristics of a sale and is replete with so many of the elements normally found in an equity contribution (cf. *Emanuel N. (Manny) Kolkey*, 27 T.C. 37 (1956), affd. 254 F. 2d 51 (C.A. 7, 1958), and *Bruce v. Knox*, 180 F. Supp. 907 (D. Minn. 1960)) that it appears to us as nothing more than a shabby attempt to withdraw from petitioner, at capital gains rates, the developer's profit normally inherent in the subdivision and sale of raw acreage such as the Burr Oaks property.

This Court has been required upon numerous occasions to determine the true nature of alleged sales or transfers of assets to corporations. In the *Kolkey* case, we listed the following questions as among the relevant criteria for making such a determination:

Was the capital and credit structure of the new corporation realistic? What was the business purpose, if any, of organizing the new corporation? Were the noteholders the actual promoters and entrepreneurs of the new adventure? Did the noteholders bear the principal risks of loss attendant upon the adventure? Were payments of "principal and interest" on the notes subordinated to dividends and to the claims of creditors? Did the noteholders have substantial control over the business operations; and if so, was such control reserved to them as an integral part of the plan under which the notes were issued? Was the "price" of the properties, for which the notes were issued, disproportionate to the fair market value of such properties? Did the noteholders, when default of the notes occurred, attempt to enforce the obligations? [*Emanuel N. (Manny) Kolkey, supra* at 59.]

We have set forth in our Findings of Fact, with some degree of specificity, the various factors which cause us to conclude that the transfer of the Burr Oaks property to petitioner was an equity contribution, rather than a sale. We set forth below some of the more significant factors which led us to this conclusion.

In the first place, petitioner, from the start of its existence, was not only undercapitalized, but, in fact, had no significant capitalization at all. Cf. *Hoguet Real Estate Corporation*, 30 T.C. 580, 598 (1958). Thus, petitioner was organized in October with a paid-in capital of $4,500. Shortly thereafter, when Elkind, Watkins, and Ritz transferred the Burr Oaks property to petitioner, its books of account reflected liabilities of $360,000. In addition, it was contemplated from the very outset of petitioner's existence that although the city of Madison would initially pay the major portion of the cost of improving the Burr Oaks property, petitioner would, nevertheless, be required to incur substantial development costs. Petitioner estimated that these costs would be in excess of $100,000.

Another factor indicating that petitioner was undercapitalized and did not have sufficient funds with which to commence business

is that on November 30, 1957, less than 2 months after it was formed, it borrowed $15,000 from Elkind. On February 28, 1958, it borrowed an additional $10,000 from Elkind.

Moreover, the land transferred to petitioner by Elkind, Watkins, and Ritz was its only asset of significance and, without it, petitioner could not have engaged in business. See and compare *Edward G. Janeway*, 2 T.C. 197 (1943), affd. 147 F. 2d 602 (C.A. 2, 1945) ; *Aqualane Shores, Inc.*, 30 T.C. 519 (1958), affd. 269 F. 2d 116 (C.A. 5, 1959). It was at all times contemplated by Elkind, Watkins, and Ritz that the land would remain at the risk of petitioner's business.

It is generally recognized that one of the crucial factors in determining whether the transfer of property to a thinly capitalized corporation constitutes a bona fide sale, rather than a mere contribution to capital, is the anticipated source of payment to the transferor. *Gilbert* v. *Commissioner*, 262 F. 2d 512, 514 (C.A. 2, 1959), affirming a Memorandum Opinion of this Court, certiorari denied 359 U.S. 1002 (1959). If payment to the transferor is dependent solely upon the success of an untried, undercapitalized business, the prospects of which are uncertain, the transfer of property raises a strong inference that it is, in fact, an equity contribution. But cf. *Miller's Estate* v. *Commissioner*, 239 F. 2d 729, 733 (C.A. 9, 1956), reversing 24 T.C. 923 (1955) ; *Sheldon Tauber*, 24 T.C. 179, 181–182 (1955) ; and *Ainslie Perrault*, 25 T.C. 439 (1955), affirmed per curiam 244 F. 2d 408 (C.A. 10, 1957), where repayment of the notes involved was dependent upon the continued success of an established business with a good earnings record and excellent future prospects.

At the time of the transfer of the Burr Oaks property to petitioner, its business prospects can only be described as speculative and uncertain.[7] Elkind, Watkins, and Ritz realized that the only way petitioner could raise the $100,000 needed by it for improvements would be from sales of lots. It is obvious that the only hope that Elkind, Watkins, and Ritz had of obtaining repayment of the so-called promissory notes depended upon the successful development and sale of the lots in the Burr Oaks property.

Despite the fact that the respective interests of Elkind, Watkins, and Ritz in petitioner were represented by what purported on their face to be promissory notes in the principal amount of $110,000, the evidence before us indicates that it was the intent of all concerned with the affairs of petitioner that these instruments would give Elkind,

---

[7] It was argued on behalf of petitioner and Watkins, Elkind, and Ritz that at the time of the transfer of the property to petitioner a number of lots were ready for sale and that because of the money that could be derived therefrom petitioner did not need a great deal of capital at the time of its incorporation. However, there was no assurance that petitioner would be able to sell any of these lots right away. As matters actually developed, petitioner encountered difficulty in selling lots after it was formed, which caused it to borrow money from Elkind.

Watkins, and Ritz a continuing interest in petitioner's business. The instruments issued by petitioner to Elkind, Watkins, and Ritz recited that they were to mature in 2 years from the date of issuance. However, after a review of the entire record, we believe that it was understood that no payment would be made on the notes, or would ever be demanded by Elkind, Watkins, and Ritz, which in any way would weaken or undermine petitioner's business. See *Charter Wire, Inc.* v. *United States*, 309 F. 2d 878, 881 (C.A. 7, 1962). It is true that petitioner during 1959 paid $31,000 apiece to Elkind, Watkins, and Ritz with respect to their so-called promissory notes.[8] However, petitioner's history with regard to making payments on the alleged promissory notes indicates that the payments thereon came only from gains derived through the sale of lots. Moreover, the fact that there was outstanding a substantial principal balance ($46,000) on each of the notes issued to the individual petitioners even as late as the time of the trial herein indicates that the alleged notes were intended to give the individual petitioners a continuing equity interest in petitioner. See *Charter Wire, Inc.* v. *United States, supra* at 881.

The evidence clearly indicates that although Elkind, Watkins, and Ritz were not stockholders of record in petitioner, nevertheless, they completely dominated and controlled petitioner's affairs. Watkins was petitioner's president. Petitioner's board of directors consisted of Elkind, his wife, Ritz, his brother Philip, Watkins, and Watkins' wife. McGinnes, the man who ran petitioner's day-to-day affairs, had been employed by Elkind in one capacity or another for a period of at least 15 years. His activities were generally supervised by Ritz' accounting firm. After listening to his testimony and that of Elkind, Watkins, and Ritz, we are convinced that McGinnes operated petitioner in accordance with their wishes.

Petitioner's shareholders of record consisted of Ritz' brothers Philip and Erwin, Elkind's wife, and Watkins' wife. They knew and understood little, if anything, of the nature of petitioner's business. Moreover, after listening to the testimony at the trial, it was obvious to us that they were subject to the control of Elkind, Watkins, and Ritz.

By virtue of the provision in petitioner's articles of incorporation regarding the issuance of additional shares of common stock at such prices as a majority of the board of directors should determine, El-

---

[8] On brief, it is argued on behalf of the various petitioners herein that the series of exchanges of notes that occurred at the end of December 1959 between Elkind, Watkins, and Ritz, on the one hand, and petitioner, on the other, constituted a repayment by petitioner of the "unpaid principal balance" in the amount of $79,000 on each of the alleged promissory notes, followed immediately by an advance of a similar amount by each of the individual petitioners. This alleged repayment by petitioner of an aggregate of $237,000 took place at a time when petitioner's liquid assets totaled less than $5,500. It is too much to ask this Court to believe that such an obvious sham constituted a repayment of the alleged notes. Cf. *Arthur L. Kniffen*, 39 T.C. 553, 565–566 (1962).

kind, Watkins, and Ritz were in a position to appropriate to themselves (through the issuance of additional common stock at whatever price they chose) substantially all of the profits that petitioner might realize after repaying its purported indebtedness to them.

The record also indicates that in transferring the Burr Oaks property to petitioner, Elkind, Watkins, and Ritz assigned a highly inflated value to said property.[9] Cf. *Emanuel N. (Manny) Kolkey*, *supra* at 61. The transfer of the Burr Oaks property to petitioner seems to us an integral part of a plan devised by Ritz whereby Ritz, Watkins, and Elkind could obtain an assured participation in the fruits of the development and subdivision of said property. See *Bruce* v. *Knox, supra* at 912. Watkins and Ritz both admitted that petitioner was formed in order to allow them to receive some part of the development profits. The inflation of the "sales price" to petitioner served to extend the period during which Elkind, Watkins, and Ritz could participate in petitioner's business as "creditors" and increased the amount which they could withdraw as "principal" if the venture proved successful.

These are some of the factors which led us to conclude that the promissory notes received by Elkind, Watkins, and Ritz did not represent a true indebtedness. The purported promissory notes issued to the individual petitioners in our opinion constitute preferred stock.[10] See *1432 Broadway Corporation, supra* at 1166; *Foresun, Inc.*, 41 T.C. 706, 717 (1964), on appeal (C.A. 6, Apr. 20, 1964); and *Sherwood Memorial Gardens, Inc., supra* at 230.

Having decided that for tax purposes the so-called promissory notes issued to Elkind, Watkins, and Ritz constitute an equity interest in petitioner, we must now determine whether the transfer of the Burr Oaks property is governed by section 351.

Section 351 deals with transfers of property to a corporation controlled by the transferor or transferors. In pertinent part that section provides:

(a) * * * No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities

---

[9] An expert witness introduced by petitioner testified that the Burr Oaks property was worth at least $360,000 when it was transferred to petitioner in November of 1957. However, we found the evidence presented by respondent's expert witness that the property had a fair market value of approximately $125,000 far more convincing, although not fully persuasive. On the basis of the evidence before us, we found the Burr Oaks property to have a fair market value of not more than $165,000 at the time of its transfer to petitioner.

[10] Although we have found the purported promissory notes to constitute equity interests in petitioner for tax purposes, we believe that the holders of those instruments occupied a preferred position vis-a-vis the holders of the common stock. In the first place, the purported promissory notes called for the payment of interest at 6 percent a year. This provision constituted a prior charge on the earnings of petitioner in favor of the holders of those instruments, not unlike a preferred dividend. Thus, we regard the purported promissory notes as preferred stock.

in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. * * *

Section 368(c) defines "control" for purposes of section 351 as meaning "ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation."

In contending that section 351 does not govern the transfer of the Burr Oaks property, petitioner has presented three arguments. Two of these arguments (that the transaction was a sale and that no stock or securities were issued to the transferors of the property) have been previously considered and resolved adversely to petitioner. The third argument presented is that Elkind, Watkins, and Ritz, who transferred the Burr Oaks property to petitioner, were not, immediately after that transaction, in control of that corporation within the meaning of the term "control" as defined in section 368(c). Thus, it is contended that even if the promissory notes held by Elkind, Watkins, and Ritz constituted stock, that stock did not carry with it any voting rights. Petitioner further points out (1) that pursuant to its bylaws the right to vote was reserved exclusively to the shareholders of record, namely, Elkind's wife, Watkins' wife, and Ritz' two brothers, and (2) that, for the above reason, the transferors of the Burr Oaks property (Elkind, Watkins, and Ritz) failed to comply with the control requirements set forth in section 368(c) because they did not possess "ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote." There is a basic fallacy in petitioner's argument in that it is premised on the assumption that Elkind, Watkins, and Ritz were the only transferors of property to petitioner.

As we view the transaction, Elkind, Watkins, and Ritz acted together with Elkind's wife, Watkins' wife, and Ritz' two brothers in forming petitioner. The record clearly indicates that each of them transferred property to petitioner. As we have previously found, Elkind's wife, Watkins' wife, and Philip and Erwin Ritz transferred to petitioner a total of $4,500 shortly after its incorporation. It is settled law that money constitutes property for purposes of section 351. *American Bantam Car Co.*, 11 T.C. 397 (1948), affirmed per curiam 177 F. 2d 513 (C.A. 3, 1949), certiorari denied 339 U.S. 920 (1950). In return therefor, petitioner issued to them an aggregate of 450 shares of its common stock. Shortly thereafter, Elkind, Watkins, and Ritz transferred to petitioner their respective interests in the Burr Oaks property and, in return, received what on its face purported to be promissory notes, but what we have previously determined to be preferred stock.

Although Elkind, Watkins, and Ritz may not have received their preferred stock interests in petitioner at exactly the same time as the common stock was issued to Ritz' brothers and the respective wives of Elkind and Watkins, it seems clear that the transfers of cash and the Burr Oaks property to petitioner were integral parts of a unified transaction. *Camp Wolters Enterprises* v. *Commissioner*, 230 F. 2d 555, 559 (C.A. 5, 1956), affirming 22 T.C. 737 (1954), certiorari denied 352 U.S. 826 (1956). See also section 1.351–1(a)(1), Income Tax Regs., which provides:

The phrase "immediately after the exchange" does not necessarily require simultaneous exchanges by two or more persons, but comprehends a situation where the rights of the parties have been previously defined and the execution of the agreement proceeds with an expedition consistent with orderly procedure. * * *

On the basis of the record before us, it appears to us that Elkind, Watkins, and Ritz, together with Ritz' brothers, Elkind's wife, and Watkins' wife, were in control of petitioner, as defined in section 368 (c), immediately after their transfer of property to it. The fact that Elkind, Watkins, and Ritz received no common stock, which according to petitioner's articles of incorporation was the only class of stock entitled to vote, is of no significance; for there is no requirement in section 351 that each transferor receive voting stock for that section to be applicable. See *Cyrus S. Eaton*, 37 B.T.A. 715 (1938), which involved the transfer of property by two persons to a controlled corporation. One transferor therein received only common stock and the other received only nonvoting preferred. In commenting upon the question of control, we stated: "Inasmuch as the transferors * * * owned all of the stock of the corporation, they have the necessary control required by the statute." [11] See also *Gus Russell, Inc.*, 36 T.C. 965 (1961).

Since the nonrecognition provisions of section 351 apply to the transfer of the Burr Oaks property to petitioner, petitioner's basis in said property is limited to $100,000, which is a carryover basis from the transferors. Sec. 362(a)(1). [12]

Insofar as the distributions made by petitioner during 1959 to Elkind, Watkins, and Ritz are concerned, we have previously found that, to the extent they purported to be a repayment of the "promissory

---

[11] This Court ultimately held that the nonrecognition provisions of sec. 112(b), I.R.C. 1939 (the predecessor of sec. 351), did not apply because the transferors failed to comply with the provisions of the "substantially proportionate" test which Congress deleted from the section when it was reenacted as sec. 351, I.R.C. 1954.

[12] SEC. 362. BASIS TO CORPORATIONS.

(a) PROPERTY ACQUIRED BY ISSUANCE OF STOCK OR AS PAID-IN SURPLUS.—If property was acquired on or after June 22, 1954, by a corporation—

(1) in connection with a transaction to which section 351 (relating to transfer of property to corporation controlled by transferor) applies, * * *

then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer.

notes," they were a sham. The net effect of the various payments by petitioner and exchanges of notes was that petitioner distributed $31,000 apiece to Elkind, Watkins, and Ritz in 1959. To this extent, the distributions resemble a redemption of stock in that the respective interests of these three individuals in petitioner were proportionately lessened. However, we are unable to find that said distributions fit within any of the paragraphs of section 302(b). Therefore, the $31,000 distributed by petitioner to Watkins, Elkind, and Ritz is governed by section 302(d) and to the extent of petitioner's earnings and profits is to be treated as a dividend.[13]

*Decisions will be entered under Rule 50.*

---

[13] Petitioner's earnings and profits for the taxable years relevant hereto will be determined in the Rule 50 computation.

