F. Devere Fleming v. Commissioner.
Fleming v. Commissioner
Docket No. 445-64.
United States Tax Court
T.C. Memo 1966-251; 1966 Tax Ct. Memo LEXIS 33; 25 T.C.M. (CCH) 1284; T.C.M. (RIA) 66251; November 14, 1966
*34 Edgar W. Pugh, Penobscot Bldg., Detroit, Mich., for the petitioner. Charles H. Powers, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined deficiencies in petitioner's income tax as follows: Year
Deficiency
1956
$3,330.46
1957
5,432.52
1958
3,649.93
1959
4,881.12
1960
499.15
1961
5,379.44
The issues are (1) whether certain gains realized by petitioner resulted from the sale of an option or from the sale of real estate; (2) whether petitioner reported such gains in the proper taxable year; (3) whether petitioner realized long-term capital gains in the transfer of his interest in certain real estate to a corporation, and (4) whether the gains realized or income received by petitioner in connection with the transfer of his real estate interest to the corporation were reported by him in the proper taxable year. Findings of Fact Some of the facts were stipulated and they are so found. Petitioner F. Devere Fleming is a resident of Livonia, Michigan. He filed his Federal income tax returns for the years 1956 through 1961 with the district director of internal revenue, Detroit, Michigan. *35 Petitioner was 75 years old at the date of the trial. Petitioner was in the building and real estate business during the 1920s in Detroit and in Farmington, Michigan. During the 1930s he worked for the Ford Motor Company for a few years and then went into the home insulation business until World War II. After the war, petitioner went to Livonia, Michigan, and worked for some years as a broker with one Harry S. Wolfe, who was a real estate broker, and then left to get a real estate broker's license and establish himself as a real estate broker. Petitioner was involved with various real estate properties during this later period as an officer of various companies. Petitioner's real estate broker's license expired about 1956. Under date of May 28, 1953, an option agreement was executed by Howard M. Warner and his wife, Clarissa, Susan Edessa Slocum, Helen Warner Gaukler, Frederick M. Warner and his wife, Phyllis, and Dorothy W. Bowie (referred to collectively in the agreement as "Sellers") and petitioner, who was referred to as the "Purchaser" which gave petitioner the option to purchase about 58 acres of real estate in Farmington known as the Treadway Farm. Paragraph 2 of the option *36 agreement stated that "[it] is the intent and purpose of [petitioner] to subdivide, improve and sell the premises above described, parcel by parcel" and to that purpose petitioner "has caused to be prepared a preliminary plan of subdivision of said premises, a copy of which preliminary plan is hereto attached, * * * identified by the signature thereon of the parties hereto, and incorporated herein by reference." Paragraph 3 divided the property into five units, giving a purchase price (ranging from $14,000 to $32,200) for each unit purchased under the terms of the option. The aggregate purchase price (exclusive of interest and taxes) under the option for all the units was $110,200, computed on the basis of sale of an estimated 58 acres at $1,900 per acre. Paragraph 4 stated that "[this] option shall expire at twelve o'clock noon (Eastern Standard Time) on the 30th day from and after the date of this option unless, prior thereto, the [petitioner] shall have elected to exercise hereunder as to Unit One." Paragraph 4 further provided that, in the event that petitioner should exercise his option to purchase Unit One within 30 days, then the option would be extended for stated periods *37 for the remaining four units. Paragraph 5 of the option agreement provided as follows: EXERCISE OF OPTION. This option shall be exercised only by written notice of election to exercise signed by the purchaser and delivered to Howard M. Warner, one of first parties, or, in the event of his death, to such other of first parties as they shall specify in writing. Such notice of election may be delivered personally or may be delivered by depositing the same in the United States mail, registered, with postage fully prepaid, in an envelope addressed to Howard M. Warner at Farmington, Michigan. Such notice of election shall be delivered or mailed within the periods above limited. Such notice shall plainly specify (1) the unit as to which such notice applies; (2) the method of purchase desired by purchaser, whether in accordance with Paragraphs (a), (b) or (c) of Section VI of this agreement; and (3) the exact metes and bounds description of the unit included in said notice. A certified or cashier's check, payable to the order of Howard M. Warner, in amount of $100.00 for each unit specified in such notice shall accompany said notice. Paragraph 6 of the option agreement provided that *38 the various units were to be purchased by petitioner on the following terms: * * *
(a) Payment of the purchase price in cash or by certified or cashier's check upon delivery of the usual warranty deed conveying unencumbered marketable title to said unit. (b) Payment of the sum of One Hundred Dollars per unit in cash or by certified or cashier's check, and the execution of a land contract (using the latest revised Abstract and Title Guaranty Company form) acknowledging payment of that sum and providing for payment of the purchase money on or before three years from the date of said land contract, with interest at the rate of five per cent per annum payable semiannually. * * *
(c) Payment of a sum equal to twenty-five per cent or more of the purchase price in cash or by certified or cashier's check and the execution and delivery of land contract (using latest revised Abstract and Title Guaranty Company form) acknowledging payment of that sum and providing for payment of the balance of the purchase price within five years from date of contract in monthly payments of not less than one per cent of the balance of the purchase price secured by said contract, together with *39 interest at the rate of five per cent per annum, payable monthly. (d) Units 1, 2 and 5 may be purchased only under the provisions of Paragraphs (a) or (b) above and cannot be purchased under the provisions of Paragraph (c). If purchaser elects to purchase either Units 1, 2 or 5 for cash, in accordance with Paragraph (a), no conveyance will be delivered unless and until subdivision improvements above referred to are installed, or bond or escrow deposit to insure such installation is furnished. Subparagraph 8(g) of the option agreement stated that "[it] is understood and agreed that this option cannot be assigned by the party of the second part [petitioner] without the written approval of the parties of the first part." On January 5, 1954, Howard M. Warner and his wife, Clarissa, Frederick M. Warner and his wife, Phyllis, Dorothy W. Bowie, Susan Edessa Slocum and Helen Warner Gaukler, [1] as sellers, and petitioner, as purchaser, executed a land contract which covered two parcels of real property comprising about 11.3 acres (known as the Alta Loma Park Subdivision) and about 15.7 acres (known as Alta Loma Park Subdivision No. 2). The acreage covered by the land contract was *40 part of the Treadway Farm. The land contract provided for a down payment of $100 with the balance of $87,870 payable within 3 years with interest of 5 percent. On February 10, 1954 all of the parties listed as sellers in the land contract and petitioner executed the "Deduction" of the original plat of Alta Loma Park Subdivision (containing 23 lots). On February 15, 1954 petitioner executed a "Purchaser's Assignment of Land Contract" in which he assigned his purchaser's interest in the land contract of January 5, 1954 to Farmington Properties, Inc. It was agreed between petitioner and the corporation that he was to receive one-half of the profits realized from the development and sale of the property covered by the land contract. Farmington Properties, Inc. was incorporated under the laws of Michigan in 1949. During the years 1954 through 1961 the outstanding stock of this corporation was held by three brothers, Paul *41 E., Charles R. and Jerome Kelly, and their sister Karen. On March 29, 1954 the plat for the Alta Loma Subdivision was recorded with the Register of Deeds, Oakland County, Michigan. On December 10, 1954, Farmington Properties, Inc. executed a "Dedication" for the plat of Alta Loma Park Subdivision No. 2 which was recorded with the Register of Deeds, Oakland County, Michigan, on December 21, 1954. On September 1, 1954 Howard M. Warner and his wife, Clarissa, Frederick M. Warner and his wife, Phyllis, Dorothy W. Bowie, Susan Edessa Slocum and Helen Warner Gaukler, as sellers, [2] and petitioner, Paul E. Kelly and his wife, Shirley, and Charles R. Kelly and his wife, Barbara, as purchasers, executed a land contract covering the remaining acreage (about 31 acres) of the Treadway Farm and known as Alta Loma Park Subdivision No. 3. The land contract provided for a down payment of $100 and the balance of $26,904 payable within five years with interest at 5 percent. On September 2, 1954 petitioner quitclaimed to Farmington Properties, Inc., all of his interest in the Treadway Farm (57.81 acres), which included Alta Loma Park Subdivision No. 3, and the quitclaim deed was recorded with the *42 Register of Deeds on September 10, 1954. On September 2, 1954 petitioner executed an "assignment" in which he purportedly assigned to Farmington Properties, Inc. all of his rights under the option agreement of May 28, 1953 for the purchase of the Treadway Farm. On September 8, 1954, September 24, 1954 and October 22, 1954 Howard M. Warner and the other parties listed as sellers in the land contract dated January 5, 1954 executed warranty deeds to Farmington Properties, Inc. for the land contained in Alta Loma Park Subdivision and Alta Loma Park Subdivision No. 2. In each of the three warranty deeds the warranties contained therein expressly excluded all encumbrances to title arising after January 5, 1954, the date of the land contract covering said properties. On October 29, 1954 Howard M. Warner and the other parties listed as sellers in the land contract dated September 1, 1954 gave a warranty deed for the land contained *43 in Alta Loma Park Subdivision No. 3 to petitioner, Paul E. and Shirley J. Kelly, and Charles R. and Barbara R. Kelly. On September 12, 1957 a settlement agreement was entered into between petitioner and Farmington Properties, Inc. under which it was determined that the petitioner's share of the proceeds from the sale of lots in Alta Loma Park Subdivision and Alta Loma Park Subdivision No. 2 was $22,472.48. At the time of the settlement agreement, loans which had previously been made by Farmington Properties, Inc. to petitioner were set off against the petitioner's share of the proceeds. Petitioner gave a note dated September 12, 1957 in the principal amount of $8,905.75 to Farmington Properties, Inc. to cover the net amount he owed Farmington Properties, Inc. as of the settlement date. Petitioner reported the amount of $22,472.48 in his 1957 income tax return as long-term capital gain from the sale of an option on investment property. Respondent determined in his statutory notice of deficiency that the amount of $22,472.48 was taxable as ordinary income in 1957. On April 21, 1955 the Suburban Land Company was incorporated under the laws of Michigan with 5,000 shares of common *44 stock authorized at a par value of $10 per share. One thousand shares of common stock were subscribed for as follows: Petitioner (together with his family) 390 shares; George R. Kelly and Paul E. Kelly, 390 shares; Leo E. Devers, 220 shares. The officers of the Suburban Land Company in 1955 were: Petitioner, president; Leo E. Devers, vice-president; Charles R. Kelly, secretary; and Paul E. Kelly, treasurer. On May 2, 1955 petitioner, Paul E. and Shirley J. Kelly, and Charles R. and Barbara R. Kelly (as sellers) and the Suburban Land Co. (as purchaser) executed a land contract under which Suburban Land Co. agreed to pay the sellers $162,000 for their interest in the property which was later included in Alta Loma Park Subdivision No. 3. Suburban Land Co. issued a note in the amount of $8,100 to the sellers as down payment for the land purchase and subsequently in 1956 issued notes to the sellers for the balance. Petitioner received eight notes from Suburban Land Co., payable periodically, in the total amount of $76,950. The corporation also issued notes to the Kellys for their share of the selling price in the total amount of $76,950. About June 1, 1955 Suburban Land Co. acquired *45 approximately 4 acres of land adjacent to the land acquired on May 2, 1955. On July 29, 1955 the plat for Alta Loma Park Subdivision No. 3 was filed with the Register of Deeds, Oakland County, Michigan. On June 7, 1955, Suburban Land Co. borrowed $50,000 from E. Viola Kelly, the mother of Paul E. and Charles R. Kelly, and gave her its note for that amount, payable in 12 months with interest at 6 percent. As security for the loan petitioner, Paul E. Kelly and his wife, and Charles R. Kelly and his wife assigned their respective interests in the property covered by the land contract dated May 2, 1955 to E. Viola Kelly. The note in the face amount of $50,000, provided in part that "[all] money received from sale of above described land [i.e., covered by the land contract 5/2/55] to be applied on principal and interest until this note is fully paid." Suburban Land Co. subsequently borrowed an additional $25,000 from E. Viola Kelly. Suburban Land Co. repaid loans and accrued interest to E. Viola Kelly as follows: Oct. 3, 1956
$30,000.00
Nov. 5, 1956
15,000.00
Dec. 4, 1956
15,000.00
Feb. 23, 1957
9,679.17
Sept. 19, 1957
5,320.83
Suburban Land Co. reported *46 gross sales of lots in the fiscal years ending March 31, 1956 through 1960 in the respective amounts of $47,800, $240,050, $10,300, $20,015, and $20,100 or total gross sales in the amount of $338.265. Suburban Land Co. made periodic payments on the notes issued to petitioner and as of April 1961 the corporation was still indebted to petitioner for $17,950, which the corporation satisfied on that date by transferring to petitioner four lots with an agreed upon total value of $16,920 and a check for $1,030. On or about April 15, 1961, the Suburban Land Co. acquired petitioner's 70 shares of stock in that corporation at $25 per share, or a total of $1,750. On his 1956 income tax return the petitioner showed (1) that he had sold about 30 acres of farm land on July 1, 1955 for $80,577.50 and realized a profit from the sale in the amount of $67,077.50 (83.25 percent of the selling price); (2) that he elected to report the long-term capital gain from such sale on the installment method; (3) that he received a total of $14,050 during 1956; and (4) that $11,696.62 (83.25 percent of $14,050) was reported as long-term capital gain under the installment method. Petitioner reported amounts *47 collected in his income tax returns for 1958, 1959 and 1960 in the respective amounts of $20,000, $20,000 and $4,733, and under the installment method included a proportionate part of these collections in his income as long-term capital gains for 1958, 1959 and 1960 in the respective amounts of $16,560, $16,560 and $3,918.92. Respondent determined that the payments made to petitioner by Suburban Land Co. were taxable as ordinary income in the following amounts (after adjustments): 1956
$11,633.40
1958
16,560.00
1959
20,286.00
1960
3,726.00
1961
14,862.60
Opinion The first issue is whether (1) an option to purchase real estate or (2) an interest in real estate was sold by petitioner early in 1954 to Farmington Properties, Inc. Petitioner contends that he sold to the corporation an option which he had acquired from the Warner interests in May 1953 and that, since the option was a capital asset held for more than 6 months, the gain realized from the sale was taxable as a long-term capital gain. On the other hand, respondent contends that petitioner did not sell an option but, instead, sold to the corporation in February 1954 his interest in two parcels of *48 realty (Alta Loma Park Subdivision and Alta Loma Subdivision No. 2) acquired by him from the Warner interests on January 5, 1954 and that, since the interest in realty was held by petitioner less than 6 months, the gain realized from the sale was taxable as ordinary income and not taxable as a long-term capital gain. To the extent that it is applicable here, section 1222(3) of the 1954 Code defines long-term capital gain as gain resulting "from the sale or exchange of a capital asset held for more than 6 months." It is quite evident from the record that the option obtained by petitioner on May 28, 1953 from the Warner interests to purchase the 57.81 acres of land known as the Treadway Farm was no longer in effect some 8 months later when petitioner contracted to buy the two parcels of land consisting of a portion (some 27 acres) of the Treadway Farm. The option agreement was a 10-page instrument carefully drafted in great detail. It explicitly stated that the option would expire in 30 days unless, within that time, petitioner exercised his option by written notice to purchase a described *49 portion of the farm. Petitioner admittedly did not do so. Petitioner testified that the option was continued from time to time on the basis of a handshake with Howard M. Warner. We doubt that an elaborately detailed option agreement would be extended in such a casual manner. Another serious objection to petitioner's explanation is that, while the original option was executed by 6 parties designated as sellers in addition to Howard M. Warner, there is no evidence to show that these 6 parties ever gave their consent to the purported extensions or were even aware of them. We cannot, on the basis of petitioner's vague and generally unsatisfactory explanation, find that the option of May 28, 1953, or any other option from the Warner interests, was still in effect in January and February of 1954. In Mathieu v. Wubbe, 330 Mich. 408, 47 N.W. 2d 670 (1951), the Supreme Court of Michigan, discussing some of the salient characteristics of an option to purchase realty, stated that "'[it] is well settled by the decisions that an option is a mere offer, and that acceptance thereof must *50 be made within the time allowed or the optionee's rights thereunder will be lost'" and that "'substantial compliance with the terms of the option is not sufficient to constitute an acceptance of the offer.'" The Court further stated that "'[an] option is but an offer, strict compliance with the terms of which is required; acceptance must be in compliance with the terms proposed by the option both as to the exact thing offered and within the time specified; otherwise the right is lost.'" There is another defect in petitioner's argument, i.e., that he transferred a valid option, and that is that the argument ignores or tries to put a new face on what actually took place. In other words, petitioner seems to be asking us to recast the transaction in which his interest in the two parcels of realty was transferred by him to Farmington Properties, Inc. Thus, even if we assume that a valid option was still in existence early in 1954, our inquiry would still remain whether, as a factual matter, petitioner sold an option to property or an interest in such property as of the relevant date. See Goldstein v. Allen, 306 F. 2d 711 (C.A. 10, 1962); Miller v. Commissioner, 295 F. 2d 538 *51 (C.A. 8, 1961); Blick v. Commissioner, 271 F. 2d 928 (C.A. 3, 1959); and Barber v. United States, 215 F. 2d 663 (C.A. 8, 1954). On January 5, 1954 petitioner contracted to purchase the two parcels of realty (about 27 acres) which was part of the Treadway Farm. The land contract was executed by Howard M. Warner and 6 other parties as sellers, and provided for a total selling price of $87,970. On February 15, 1954 petitioner transferred his interest in the land contract to Farmington Properties, Inc. with the agreement that he would receive one-half of the profits realized from the development and sale of lots by the corporation on the two parcels of land. [3] Nothing in these transactions would suggest that petitioner was selling or assigning an option to Farmington Properties, Inc.[4] Instead, the February 15, 1954 transaction was clearly and unequivocally a transfer of petitioner's interest in the property acquired by him under the January 5, 1954 land contract. *52 There is in evidence a purported assignment by petitioner to Farmington Properties, Inc. on September 2, 1954 of all his rights under the May 28, 1953 option agreement for the purchase of the entire Treadway Farm. But by then the remaining portion (about 31 acres) of the Treadway Farm had already been sold by its owners to petitioner and his associates and, consequently, we do not see what petitioner hoped to achieve by the transfer of the option. Moreover, the May 28, 1953 option explicitly provided that it could not be assigned by petitioner without the written approval of Howard M. Warner and the other 6 parties named as sellers in the option. There is no evidence of such written approval in the record. We find, on the basis of the entire record, that petitioner acquired his interest in the two parcels of realty under the January 5, 1954 land contract and conveyed such interest to Farmington Properties, Inc. on February 15, 1954. Since petitioner's holding period for this interest was less than the requisite 6 months, see section 1222 of the 1954 I.R.C., he was not entitled to treat the gains realized by him from such transfer as a long-term capital *53 gain. When petitioner transferred his interest in the two parcels of realty to Farmington Properties, Inc. in February 1954, it was agreed that he would receive one-half of the profits realized by the corporation from the sale of lots. Beginning with an advance of $13,500 in October 1954 petitioner received a series of payments from the corporation and finally in 1957, when it was determined that petitioner's one-half share of the profits would be $22,472.48, petitioner and the corporation reached a settlement agreement which showed, after considering the prior advances and other adjustments, that petitioner owed the corporation the net amount of $8,905.75. Petitioner gave the corporation a note in this amount as of the settlement date. Petitioner reported the gain of $22,472.48 in his 1957 income tax return. Now he contends that this was incorrect and that the gain should have been reported in 1954, a year not before us. There is no merit in this argument. Petitioner's contention (in the single paragraph he devotes to this argument in his opening brief) seems to be (1) that he received advances from the corporation in 1954 and 1955 totaling $27,438.54; (2) that since he received *54 more than 30 percent of the ultimate sales price in 1954 he could not elect the installment method; and (3) consequently, the entire gain of $22,472.48 should have been reported in 1954. We need not dwell upon the shaky logic of this argument. It is enough to say here that the advances to petitioner by the corporation were clearly loans and were treated as such by the parties. Each advance was made with interest at 6 percent and the record shows that petitioner paid interest on the loans made to him beginning in 1954 in the total amount of $3,233.74. Thus there is no justification for treating these advances as portions of the sales price which were properly reportable in prior years. In short, petitioner, a cash basis taxpayer, received no payment under the contract until 1957, the year he reported the gain of $22,472.48. The next issue involves the proper tax treatment of payments made by Suburban Land Company to petitioner in the years 1956, 1958, 1959, 1960 and 1961 in the respective amounts of $11,633.40, $16,560, $20,286, $3,726 and $14,862. This issue ultimately depends upon whether the transfer of the remaining portion of the Treadway Farm (about 31 acres which formed part *55 of Alta Loma Park Subdivision No. 3) by petitioner and the Kellys to the newlyformed Suburban Land Co. in May 1955 was a sale or exchange of a capital asset held for more than 6 months or whether it was an equity contribution. The question is essentially one of fact. Gooding Amusement Co., 23 T.C. 408, affd. 236 F. 2d 159 (C.A. 6, 1956). Petitioner and the Kellys, after they had acquired this third parcel of realty, consulted with the city engineer of Farmington about getting sanitary sewers to the property and it was finally decided that it would be done satisfactorily. On April 21, 1955 the Suburban Land Company was formed with 1,000 shares of common stock of $10 par value per share issued to petitioner and his family (390 shares), the Kellys (390 shares) and one Leo E. Devers (220 shares). Petitioner was president of the new corporation, with the two Kellys and Devers also serving as officers. On May 2, 1955, petitioner and the Kellys purportedly sold this tract for $162,000 to the corporation which presumably was to subdivide, develop and sell lots on the property. The corporation issued notes in this amount to the sellers in proportion to their *56 interests in the tract and subsequently made periodic payments on such notes. In Emanuel N. (Manny) Kolkey, 27 T.C. 37, affd. 254 F. 2d 51 (C.A. 7, 1958), the various court-evolved criteria for determining the true nature of purported sales to corporations were listed by this Court as follows: Was the capital and credit structure of the new corporation realistic? What was the business purpose, if any, of organizing the new corporation? Were the note holders the actual promoters and entrepreneurs of the new adventure? Did the noteholders bear the principal risks of loss attendant upon the adventure? Were payments of "principal and interest" on the notes subordinated to dividends and to the claims of creditors? Did the noteholders have substantial control over the business operations; and if so, was such control reserved to them as an integral part of the plan under which the notes were issued? Was the "price" of the properties, for which the notes were issued, disproportionate to the fair market value of such properties? Did the noteholders, when default of the *57 notes occurred, attempt to enforce the obligations? We have applied the relevant criteria to the facts of this case and conclude that the transfer of the tract of realty to the corporation was not a sale, but an equity contribution. It is obvious that the new corporation was undercapitalized. The initial cash contribution to capital was $10,000 and much of this was soon used to purchase a small additional tract of land and for other expenses. To carry out its development program, the corporation borrowed $50,000 on June 7, 1955 from Viola Kelly, the mother of Paul and Charles Kelly, and subsequently borrowed an additional $25,000 from her. Soon after the corporation was formed its debts totaled $212,000 (land contract payable, $153,900; note down payment, $8,100; and loan from Viola Kelly, $50,000), while its capitalization stood at $10,000, a ratio of about 21 to 1. The corporation was formed to continue the work of subdividing, developing and selling the lots on various segments of the Treadway Farm which had been initiated by the petitioner and the Kellys, who were also the actual promoters and executive officers of the new corporation. The tract of land transferred by petitioner *58 and the Kellys to the new corporation was its principal asset and it is evident that it would remain at the risk of the corporation's business. The notes issued by the corporation to petitioner and the Kellys could only be paid from anticipated earnings from the sale of lots. Moreover, these notes were subordinated to the loan obtained by the corporation from Viola Kelly. It also appears that the land was transferred to the corporation at a greatly inflated value, since it was valued in the transaction at more than $5,000 per acre, while there is convincing evidence in the record that the land as of May 1955 had a more realistic fair market value of about $2,000 an acre. Finally, the notes issued to petitioner and the Kellys and payable at 6-month intervals through August 1960 were seldom paid when due, and the corporation's ledger indicates that as of the date of the trial several of the notes issued to the Kellys remained unpaid. As of April 1961 the corporation still owed $17,950 to petitioner on its notes issued to him, and the corporation satisfied this amount by transferring to petitioner 4 lots with an agreed value of $16,920 and a check for $1,030. We conclude, on the basis *59 of these factors and on the record as a whole, that the notes issued to petitioner were not a true indebtedness but, instead, constituted a form of preferred stock in the corporation. It follows, under the facts of this case, that the transfer of the tract of land to the new corporation falls within the provisions of section 351(a) of the 1954 I.R.C.[5] We believe that the formation of Suburban Land Company on April 21, 1955 and the transfer of the property to the corporation several days later (May 2, 1955) must be viewed together as integral parts of the same transaction (see section 1.351-1(a)(1), Income Tax Regs.) and since the notes issued to petitioner and the Kellys are here treated as a form of preferred stock of the Suburban Land Company, it readily appears that the nonrecognition provisions of section 351 of the 1954 I.R.C. apply to this trans-action. Burr Oaks Corp., 43 T.C. 635, affd. 365 F. 2d 24 (C.A. 7, 1966). Consequently, in computing the corporation's earnings and profits from its sales during the years here involved, the basis to the corporation for the realty *60 transferred to it by petitioner and the Kellys will be a carry-over basis under the provisions of section 362(a)(1) of the 1954 I.R.C.[6]
*61 In view of the above, we hold that the distributions made by the corporation to petitioner during the years before us as purported payments on the promissory notes are taxable as dividend distributions to petitioner to the extent of the corporate earnings and profits within the meaning of sections 301 and 316 of the 1954 I.R.C.
Decision will be entered under Rule 50. Footnotes
1. The instrument was executed for Clarissa M. Warner, Frederick M. Warner and his wife, Phyllis, and Dorothy W. Bowie by Howard M. Warner, their attorney-in-fact, and for Susan Edessa Slocum and Helen Warner Gaukler by William W. Slocum, their attorney-in-fact.↩
2. The instrument was executed for Clarissa M. Warner, Frederick M. Warner and his wife, Phyllis, and Dorothy W. Bowie by Howard M. Warner as attorney-in-fact, and for Susan Edessa Slocum and Helen Warner Gaukler by William W. Slocum as attorney-in-fact.↩
3. Warranty deeds for the two parcels of property were given in September and October 1954 to Farmington Properties, Inc. by Howard M. Warner and the other 6 parties listed as sellers in the land contract dated, January 5, 1954. ↩
4. Charles R. Kelly, secretary of Farmington Properties, Inc. in 1954, testified that the first time he ever saw the option agreement dated May 28, 1953 (Joint Exhibit 7-G) was either the day before or two days before the trial of this case.↩
5. Section 351(a) of the 1954 I.R.C. provides that "[no] gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation." Section 368(c) of the 1954 I.R.C.↩ defines "control" as meaning "the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation." 6. Section 362(a)(1) of the 1954 I.R.C. provides that if property is acquired by a corporation in connection with a section 351↩ transfer then the basis to the corporation for the property shall be the same as it would be in the hands of the transferor.